# IN THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

| | |
|---|---|
| MARTIN A. SANDORFF, | |
| Plaintiff, | Civil Action No.: |
| v. | 5:21-cv-00417 |
| JACKSON AUTOMOTIVE GROUP, INC., | |
| Defendant. | **JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW, Plaintiff Martin A. Sandorff, and brings this action pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 623. Plaintiff alleges that Defendant Jackson Automotive Group, Inc. subjected Plaintiff to discrimination based his age, including through said Defendant's termination of Plaintiff's employment, respectfully showing the Court as follows:

### JURISDICTION AND VENUE

1.

This Court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. §§ 1331 & 1343 and the enforcement provisions of the Age Discrimination in Employment Act.

2.

Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Plaintiff was employed, and the events underlying this action occurred, in Bibb County, Georgia, which is located within this judicial district.

## PARTIES

3.

Plaintiff Martin A. Sandorff (hereinafter, "Plaintiff" or "Helton") is a citizen of the United States, and he was a resident of the State of Georgia and between 40 and 70 years of age at all times at issue. At all times relevant to this suit, Mr. Sandorff was employed with Defendant Jackson Automotive Group, Inc.

4.

At all relevant times, Mr. Sandorff was considered a covered, non-exempt employee under the Age Discrimination in Employment Act.

5.

Defendant Jackson Automotive Group, Inc. (hereinafter, "Defendant") is a domestic profit corporation, incorporated under the laws of the State of Georgia. Defendant's principal address is 4781 Riverside Drive, Macon, Bibb County, Georgia 31210. Defendant may be served with process through its Registered Agent, W. Carter Bates III, located at 231 Riverside Drive, Suite 100, Macon, Bibb County, Georgia 31201.

6.

Defendant is a private employer engaged in interstate commerce with an annual revenue in excess of $500,000.00. Defendant has employed in excess of 20 employees, working for at least twenty calendar weeks, in 2020 and preceding years. Defendant is a covered employer within the meaning of the Age Discrimination in Employment Act.

**STATEMENT OF FACTS**

7.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 6, as if the same were set forth herein.

8.

Mr. Sandorff was born in 1956, and as a result, he was 63 years of age during the events underlying this litigation.

9.

On May 30, 2020, Defendant terminated Mr. Sandorff because of his age.

10.

Prior to working for Defendant, Mr. Sandorff had been employed as a sales and leasing professional, selling both new and preowned vehicles, with dealerships for several automotive brands.

11.

Mr. Sandorff had also served as the internet sales director for another dealership, and he had even owned his own web-based marketing company.

12.

Before his employment with Defendant, Mr. Sandorff had worked for dealerships selling the Mercedes Benz brand of automobiles for nearly five years.

13.

Defendant owns several automobile dealerships in the Middle Georgia area, including Mercedes-Benz of Macon, Subaru of Macon, Volkswagen of Macon, and Volvo Cars of Macon.

14.

Mr. Sandorff met all of the qualifications for the position of Sales and Leasing Professional, and he was hired by Defendant soon after he submitted an application in August 2018.

15.

Initially, there was nothing remarkable about Mr. Sandorff's employment with Defendant.

16.

However, this began to change when Defendant hired Chris Duncan as its General Sales Manager (hereinafter, "General Sales Manager Duncan").

17.

General Sales Manager Duncan would frequently make comments about or towards Mr. Sandorff concerning Mr. Sandorff's age.

18.

For example, General Sales Manager Duncan often referred to Mr. Sandorff as "grandpa" in front of other employees.

19.

To be clear, Mr. Sandorff is neither the grandparent of General Sales Manager Duncan, nor are the two individuals even related.

20.

On another occasion, after Mr. Sandorff had received a crew cut-style haircut, General Sales Manager Duncan referred to Mr. Sandorff's "high and tight" hairstyle as "white and tight," an apparent reference to Mr. Sandorff's age and gray hair.

21.

After General Sale Manager Duncan made the aforementioned comment about Mr. Sandorff's haircut, Mr. Sandorff felt the need to pull this member of management aside to explain that he did not find these jokes and comments to be appropriate. Mr. Sandorff asked him to stop.

22.

After Mr. Sandorff's complaint, General Sales Manager Duncan ceased making these comments for a short period, but he continued soon thereafter.

23.

Moreover, General Sales Manager Duncan was known to hire young people as sales and leasing professionals, including those who had previously worked for his former employer, the owner of a local Toyota dealership.

24.

The younger employees that General Sales Manager Duncan hired generally had less experience, both with the Mercedes and Volvo brands, as well as general experience in this field.

25.

As a result of General Sales Manager Duncan's hiring practices, his age-related comments, and other interactions, Mr. Sandorff soon began to think that Mr. Duncan felt threatened by Defendant's more-seasoned, and therefore older, sales professionals, or that Mr. Duncan specifically disliked Mr. Sandorff due to his age.

26.

General Sales Manager Duncan did not make similar comments toward Defendant's other older employees, but that is likely because these other sales and leasing professionals had either

been employed by Defendant several years longer than Mr. Sandorff and/or they had obtained Mercedes Benz "Master" certification.

27.

As a result, despite being older than Mr. Sandorff, these other sales and leasing professionals were seen as more valuable, and less disposable, to Defendant than Mr. Sandorff.

28.

Despite these challenges, and with the exception of one month in which Mr. Sandorff's sales had not met the threshold, Mr. Sandorff excelled at his job during remainder of 2019.

29.

In fact, Defendant highlights a number of customer reviews on its website, and as of the date of this filing, many of the reviews still explicitly reference Mr. Sandorff and the outstanding service that he provided to these reviewing-customers.

30.

Defendant often asks its sales and leasing professionals, also known as "sales reps," to take on additional duties at the dealership.

31.

For example, throughout Mr. Sandorff's tenure, Defendant always identified at least one of its sales and leasing professionals who could fill-in for the Finance Manager when such person was not scheduled to work or was otherwise unavailable.

32.

Additionally, some larger dealerships have a "product concierge," a person whose primary function is to assist customers with new car sales, including setting up technology and services

like roadside assistance, helps answer customers' questions about their new vehicle, or even to deliver the new purchase to the customer's front door.

33.

Previously, Defendant had not identified any specific person to act as the product concierge, and the duties associated with this role were split up amongst the sales and leasing professionals.

34.

At some point in or prior to 2019, Defendant specifically tapped one of its sales and leasing professionals to act as the Product Concierge. In so doing, Defendant was attempting to increase its Consumer Satisfaction Rating ("CSI") scores, which would have led to Defendant receiving additional bonuses from Mercedes Benz.

35.

When Defendant named one particular Product Concierge, Defendant also advised him that his primary duties would continue to be those of a sales and leasing professional – actively selling vehicles.

36.

In December 2019, Defendant called Mr. Sandorff into work on his day off to advise him that the former Product Concierge had been terminated. Specifically, the Product Concierge had not contributed to satisfactory CSI scores, and even more critically, he had apparently not been hitting the required threshold for the number of vehicles that he was supposed to sell.

37.

At that time, Defendant requested that Mr. Sandorff take on the duties of the Product Concierge. As Defendant explained, Mr. Sandorff was being asked to take on these additional

duties due to his knowledge and familiarity with the products sold by Defendant. Defendant also advised Mr. Sandorff that his pay for performing these duties would be in addition to his compensation as a Sales and Leasing Professional. It was Defendant's expectation that sales would continue to be Mr. Sandorff's primary responsibility.

38.

Even if Mr. Sandorff took on the additional Product Concierge responsibilities, the vast majority of his compensation would continue to be based on commission, or the volume of sales that he made during a given pay period.

39.

Defendant pays all of its sales and leasing professionals using a similar pay plan, regardless of such individual's experience or tenure.

40.

Accordingly, Defendant is generally only required to increase the compensation of a sales and leasing professional at those times when the employee obtains higher gross revenues for Defendant.

41.

Mr. Sandorff agreed to take on the additional duties of the Product Concierge in addition to his primary job as a Sales and Leasing Professional.

42.

After Mr. Sandorff accepted these additional duties, Defendant still considered him a Sales and Leasing Professional.

43.

In fact, around a month after Mr. Sandorff accepted this role, he asked Defendant's General Manager whether Defendant intended to re-code Mr. Sandorff in the internal Mercedes Benz system utilized by Defendant. The General Manager responded by explaining that "Product Concierge" had its own stand-alone code, and since Mr. Sandorff's primary duties remained those associated with a Sales and Leasing Professional, no change needed to be made in the portal to Mr. Sandorff's title.

44.

When Mr. Sandorff stepped into the role of Product Concierge, he retained nearly all of the same duties as those individuals who only served as sales and leasing professionals.

45.

When Mr. Sandorff stepped into the role of Product Concierge, the vast majority of the same employment policies, guidelines, and rules applied to both Mr. Sandorff and those individuals who only served as sales and leasing professionals.

46.

When Mr. Sandorff stepped into the role of Product Concierge, he continued to report to the same supervisor as those individuals who only served as sales and leasing professionals.

47.

Upon until the time of his termination, the business cards that Defendant provided to Mr. Sandorff continued to read "Sales & Leasing Professional.

48.

At no point did Defendant provide Mr. Sandorff with business cards that referred to him as the Product Concierge.

49.

From December 2019 into the year 2020, Mr. Sandorff performed well in his position, continuing to meet the thresholds for a Sales and Leasing Professional in addition to taking on the Product Concierge duties.

50.

However, around Spring 2020, Defendant's sales had slowed substantially as a result of the COVID-19 pandemic and the resulting impacts to the economy.

51.

As a result of these economic slow-downs, Defendant laid off a number of mechanics, service advisers, and business development employees.

52.

Defendant also furloughed two of its sales and leasing professionals around the same time, and Defendant provided the others in this position with the opportunity to take a voluntary furlough that was expected to be temporary.

53.

Mr. Sandorff, who was the primary caretaker of his elderly mother who lived with him, opted to take a voluntary one-month leave of absence in order to protect the health and safety of his mother and continue to provide her with care.

54.

Since Defendant was operating with reduced business hours at that time, Mr. Sandorff ultimately only missed around twelve working days over the course of approximately the next month.

55.

By May 2020, Defendant's business had picked back up to where they had been prior to the pandemic.

56.

Additionally, the general public had learned much more about the virus over that time, and Mr. Sandorff then believed that he would be able to safely return to work, while still being able to protect and care for himself and his mother.

57.

Mr. Sandorff advised Defendant that he was able to return to work.  However, instead, on May 30, 2021, Defendant advised Mr. Sandorff that he was being permanently laid off, effective immediately.

58.

According to Defendant, business conditions and a "reduction in workforce due to economic impact of COVID 19 pandemic" were the reasons cited for the layoff.

59.

Defendant immediately removed Mr. Sandorff's picture and biography from its website.

60.

Yet, Defendant did not delete or modify any of its customer reviews featured on its website that praised Mr. Sandorff's work.

61.

Within merely a few days from Mr. Sandorff's termination, Defendant welcomed Jalea Davis back into her position as a Sales and Leasing Professional.

62.

Ms. Davis had been one of the two sales and leasing professionals who had been involuntarily furloughed just a little over a month earlier.

63.

Mr. Sandorff had been one of the individuals who had initially trained Ms. Davis, and she had only been working for around a month before her involuntary furlough.

64.

At both the time of her furlough and her reinstatement, Ms. Davis had far less sales that Mr. Sandorff in the same period.

65.

In fact, at the time of her furlough and her reinstatement, Ms. Davis had not closed any deals on behalf of Defendant.

66.

Ms. Davis is around 40 years younger than Mr. Sandorff.

67.

At the time of her reinstatement, Ms. Davis was in her early twenties.

68.

As a result, Defendant ultimately only laid off only two of its sales and leasing professionals.

69.

As business conditions improved during the remainder of 2020, Defendant never reached out to Mr. Sandorff to ask him to return to his position.

70.

Yet, Defendant hired Chris Thomas as a new Sales and Leasing Professional within the next several months.

71.

Mr. Thomas is well under the age of 40.

72.

Defendant also hired Quinton Baldwin as a new Sales and Leasing Professional within the next several months.

73.

Mr. Baldwin is well under the age of 40.

74.

Defendant also hired Jeremy Renfroe as a new Sales and Leasing Professional within the next several months.

75.

Mr. Renfroe is well under the age of 40.

76.

In 2021, Defendant hired several more individuals, who are all well under the age of 40, as sales and leasing professionals, including Shemika Harris, Patrick Parton, and Ashley Williams.

77.

Mr. Sandorff was far more qualified to serve as one of Defendant's sales and leasing professionals than any of the individuals that Defendant hired after Mr. Sandorff had been let go.

78.

Since the time of Mr. Sandorff's voluntary furlough, Defendant has, once again, had its sales and leasing professionals responsible for post-sale customer services – the duties that had been assigned one of the two men named as Defendant's Product Concierge.

Procedural/Administrative Background

79.

On or about October 16, 2020, Mr. Sandorff submitted his Charge of Discrimination to the Equal Employment Opportunity Commission (hereinafter, "EEOC"), alleging that he had been subjected to discrimination based on his age. The EEOC assigned Mr. Sandorff Charge Number 410-2020-06510.

80.

Defendant had actual notice of the EEOC Charge, participated in the administrative proceedings, and was represented by counsel at that time.

81.

On or about August 19, 2021, the EEOC issued its undated Dismissal and Notice of Rights, which Mr. Sandorff received, through counsel, on the same day.

82.

Mr. Sandorff has exhausted his administrative remedies as to the claims in his Charge of Discrimination, and he is filing the instant action within ninety days of the EEOC's issuance of the Notice of Right to Sue.

## COUNT I:
## WRONGFUL TERMINATION IN VIOLATION OF
## THE AGE DISCRIMINATION IN EMPLOYMENT ACT

83.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 82, as if the same were set forth herein.

84.

Pursuant to the Age Discrimination in Employment Act, it is unlawful for an employer to discriminate against any individual with respect to the compensation, terms, conditions, or privileges of his or her employment because of such individual's age. 29 U.S.C. § 623.

85.

As alleged herein, Defendant has routinely treated its older employees less favorably than those who are younger. Specifically, Defendant has a history of subjecting its older employees, particularly Plaintiff, to unwelcomed comments concerning their age, and hiring younger applicants to fill the role of sales and leasing professional.

86.

Plaintiff is between the ages of forty and seventy.

87.

As alleged herein, Plaintiff was qualified for the positions of Sales and Leasing Professional and Product Concierge. Plaintiff had been performing the duties and responsibilities of his positions, and his performance was exemplary.

88.

On May 30, 2020, Defendant terminated Plaintiff's employment.

89.

The reasons that Defendant cited for terminating Plaintiff – a downturn in business and reduction in workforce due to economic impact of the COVID-19 pandemic – are patently false.

90.

If Defendant had been experiencing such a drastic downturn in business, then Defendant would not have reinstated another furloughed employee within days of Plaintiff's termination.

91.

If Defendant had been experiencing such a drastic downturn in business, then Defendant would not have hired several new employees during the remainder of 2020 and into 2021.

92.

Defendant ultimately replaced Plaintiff with, not one, but at least six new employees to serve as sales and leasing professionals.

93.

Plaintiff was more qualified than any of the at least six new employees hired to serve as a sales and leasing professional since Plaintiff's termination.

94.

The at least six employees hired to serve as sales and leasing professionals since Plaintiff's termination were all under the age of forty when they were hired.

95.

All of the at least six individuals hired as sales and leasing professionals since Plaintiff's termination were all significantly younger that Plaintiff when they were hired.

96.

Defendant will be unable to present any evidence of a legitimate, nondiscriminatory motive for terminating Plaintiff's employment and for otherwise treating Plaintiff less favorably than his coworkers who were younger than Plaintiff.

97.

Plaintiff will prove that the Defendant's stated reasons are pretextual, and that Defendant's actions were willful and indeed motivated by Plaintiff's age.

98.

Plaintiff has been injured by Defendant's discrimination based on age, and he is entitled to all damages allowed under the Age Discrimination in Employment Act, including back pay and all fringe benefits of his employment, front pay or reinstatement, injunctive relief, liquidated damages, and attorney's fees and costs of litigation, all in an amount to be proven at trial.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Martin A. Sandorff respectfully prays for the following relief:

1) That Summons and Process be issued to Defendant Jackson Automotive Group, Inc., and that said Defendant be served as provided by law;

2) That this matter be tried before a jury;

3) That judgment be awarded for and in favor of Plaintiff Martin A. Sandorff and against Defendant Jackson Automotive Group, Inc. on Count I for discrimination based on age, and grant Plaintiff all relief allowable under the Age Discrimination in Employment Act; and,

4)       For such other relief as this Court shall deem just and proper.

Respectfully submitted, this 17th day of November, 2021.

                                                         KENNETH E. BARTON III
                                                         Georgia Bar No. 301171
                                                         *Attorney for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com